I'm Assistant State's Attorney Mary Needham and I represent the people of the state of Illinois. Each side is 15 minutes, but we don't look at our watches, so if you can move it along, we'll listen to you. We would appreciate it if you'd move it along. Any time you're ready, Mr. Goetsch. Again, Your Honors, my name is Kerry Goetsch and I represent the appellant Earl Faber. I'd like to focus my time this morning on the issues that appear sequentially the last in the briefs. I'd be happy to entertain questions about any of the issues, but I chose to focus on those two issues because they both deal with Section 107A-5, Section 107A-5, Section 107A-5,  Code of Criminal Procedure that hasn't been addressed yet by the Illinois Appellate Courts. Section 107A-5 was enacted in 2003 and it deals with line-up and photo spread procedures. Two parts of the statute are relevant in this instance. Section A requires that all photographs of suspects shown to an eyewitness during a photo spread shall be disclosed to the accused or his or her defense counsel during discovery proceedings. And Section C dictates that suspects in a line-up or photo spread should not appear to be substantially different from fillers or distractors in a line-up based on the eyewitness's previous description of the perpetrator or based on other factors that would make them stand out. If you know, Mr. Goetsch, did the coppers comply with B, having the witness sign the form, saying I'm aware that maybe the offender is not in this? There's no testimony in the record about compliance with Section B as to whether a form was signed or whether a form, if a form was signed, whether it complied with the statute either. The, Sergeant Flaherty described the process that he used, but he did not specifically describe a form or the contents of a form, if there was one signed. Okay. Well, go ahead. It's clear that the statute was violated, Section A and C in this case. The state conducted two photo arrays, lost the photos, and thus couldn't comply with the mandate that those photos be disclosed during discovery. The state also conducted a live line-up, and it's clear by looking at the line-up that at a minimum, the statute was violated. Did the defendant's counsel acknowledge that he did receive copies of those photos? It's unclear. He says something in the record. I think it's clear in the record that he signed some sort of statement that he had received copies of those photos previously. There is a statement in the record that counsel says, well, I think I saw those photos early on in the proceedings, because this was a long, drawn-out, about a five-year process. But it was acknowledged at the time of the hearing on the suppression motion that the photos were lost. So while counsel said that he might have had those photos, it's not clear that anyone really had those photos as far as this trial is concerned, because they were Well, it seemed to me if the counsel had the photos, it would be a non-issue. As far as Section A, if counsel lost Doesn't that render it moot if he already had the photo, if he acknowledged he received them beforehand and that he did have them? But if the State then acknowledged that that assessment was wrong and that the photos were then lost, which I think is what happened, all parties agreed that the photos, while they existed at one time, they were inventoried by the State. Yes, but doesn't that become an issue of no significance? The attorney had them. Well, that's not Doesn't that satisfy due process? He had them. He acknowledged having them. I don't think that the attorney's statement is that concrete, that he absolutely had these photos. He acknowledged that he received discovery. I think the State's later statement was that basically those photos weren't included because otherwise the State would have also had them. They would have kept copies. Well, here the problem with the case, and that's why it occurred, there were multiple offenders and they were tried in serial form. Right. So I don't know what number Mr. Faber was. He was last. Last, okay. So I would, again, I don't know because it's not in our record, but these photo arrays were available at some other time and were probably made part of a record and then the State stupidly didn't sample them. That's what it would appear to me. And if anybody really, really wanted those photographs, if there were three or four prior trials, you would simply go to the clerk's office, assuming the State's attorney's inventoried the photographs, which they usually do not because having worked there for many years, I'm an offender as well, they don't bother. So somebody would have had these. Certainly, and again, it's not the police. This was the State's attorney's office that failed to have them. Is that right? Correct. And there was an inventory slip that said these photos existed at one time and they were inventoried by the police officer. So, yes, it was the State's attorney's office that somehow lost these. And to go beyond that point, Section C was obviously violated as well. So it wasn't just Section A. It was also Section C. So both of those sections were implicated in this case because the live lineup, if you look at it, as I was stating, it's clear that he was dressed as the description of the perpetrator was described by one of the eyewitnesses. We'd also argue that it violated the language stating that suspects should not appear substantially different. But at a minimum, the Earl Faber was dressed as the suspect was described by one of the eyewitnesses. But going to Justice Harris's question, in People v. Maloney, Justice Freeman wrote it in the First District case. And they have attached that at the end of the report, a photo of the lineup that Justice Freeman found to be terrible. There are two people on either end. One of them is the offender and one is not the offender. And there's three coppers in the middle. And the coppers are all hairs. And, frankly, they look like fraternity lads. And then you have the two people who look like criminals. And so Justice Freeman said, well, that's terrible. But this case is very strong. So we don't care that it was terrible. He actually found it was awful. It was prejudicial. And in this case, we don't have the photographs. But what we do have is, besides people testifying, that they look the same even though they didn't say them. We also have the videotaped confession of Mr. Faberson. I killed him. I'm glad. So there's no legitimate concern, is there, as to the lineup procedure getting the wrong guy. It is, indeed, a violation of the statute. And it is a violation of the statute. But there's no real concern here that, oh, they pointed to the wrong fellow, since you're not attacking the videotaped confession. He said he did it. Well, Mr. Faber did challenge the confession at trial, or pre-trial, saying it was coerced. And there was a hearing on that, which he lost. And your statement would go to whether the error was harmless. But I don't know that it's clear that we can divorce completely the eyewitness identifications from his later confession, because the identifications came before that, and then everyone started pointing to Faber. And, I mean, we've seen in other cases that there are reasons why people confess. But even if we get to the harmless error analysis, we still should define a remedy for a violation of this statute. And who should do that? Should it be the courts or should it have been the legislature? Because the legislature did not suggest a remedy, did they? They didn't say, and if the State fails to comply with 108.7.A.5, the identification testimony should be not allowed in. No, they do not specify a specific remedy. They do point to the rules of discovery, as far as for Section A. And I would suggest that really the only discovery sanction that would be adequate in this If you look at the State's analysis, it focuses on the due process argument, where the defendant is required to show bad faith and show suggestiveness in instances where the defendant doesn't have the photos. So there was a reason why the legislature felt it necessary to enact an assessment statute. And I think the reason was they wanted to take it above and beyond the typical due process analysis. And the reason was because we're recognizing now that eyewitness identifications are fallible. And I think there's a large body of work that recognizes that sort of the mindset on these things have changed. And so what the legislature wanted to do in enacting this statute was define the right where before it hadn't been as clear. But going back then to your kind of understanding your arguments based on the statute, to your very legitimate concern of perhaps these photographs were not very good, they were different characteristics. His courts addressed that twice at least in Purnell and Meredith. And Purnell was written by Justice R. Eugene Pynchon, who was hardly known as a friend of the State, where he had no problem with the idea that there were missing photographs. Understanding that was 1989, some 14 years before the statute was passed. In Meredith, we cited an Illinois Supreme Court case where similarly the police routinely when they used photo arrays, they'd save the one that was identified and return the others to books because they didn't care. And so we've said it twice and the Supreme Court sort of said it once in Brown saying what's the beef? It's not a problem. Then the statute comes out. So the statute changes. I would argue that the statute obviously changed things because otherwise what's the point of enacting the statute? And if you look at the reason for the statute, it was tied in with the death penalty reforms. And the concerns that people were being convicted based on strong eyewitness testimony that turns out to end up being false or unreliable. And so Illinois, while they didn't go as far as like state of New Jersey in enacting reforms to what is admissible, they didn't lay that out in detail in the statute. They felt that certain things were necessary. And a couple of those things were not done in this case. And one of those is disclosure of the photo array. And the other was not addressing the suspect like the eyewitness identification of the perpetrator. So the fact that the legislature, while they didn't lay out everything necessary, they didn't lay out a remedy, they obviously felt that these two things were important. And the fact that those two things were violated in this case I think is significant. But in the last three years, our Supreme Court has ruled, have they not, in a multitude of cases, saying where a statute requires something without providing for a specific remedy, then that statute is permissive only and it's not mandatory, even though it says shall. Right, it's mandatory and permissive. Right, so it is a permissive statute, which is crazy to me. I speak English when it says shall means must. Right. But the Supreme Court disagrees with us on that. But I think that this Court can still define a remedy for a violation of the statute, where no other court in Illinois has. This is the first time it's up, right? Right. In 11 years, it's never even brought up. What's the appropriate remedy, Mr. Gatch? Well, I argue in the brief and I would say exclusion. Yeah, but I wanted you to say it. Tell me what you think the appropriate remedy is. I think exclusion of the evidence would be appropriate. The testimony about the photo arrays should have been excluded. So when the witnesses got up, they shouldn't have been allowed to testify that, A, this photo array was conducted and, B, that I identified Earl Faber in it, because we don't know the details of the photo array. And I also think that the lineup identification should have been excluded because it's clear that Earl Faber is dressed as the suspect, and he's the only one. He's in a white tank top T-shirt and blue jeans, and the others are all wearing regular T-shirts. He also stands out physically, but dressing him as the perpetrator was described is something significant. And it's really the only factor that the legislature specifically listed that you cannot do. The others are kind of vague, like don't make him stick out for any reason. But one of the things they felt necessary to specify in the statute was don't dress him as the perpetrator was described, and that's what happened in this instance. You also raise a point which lots of experts in this field raise, is that Mr. Faber's photograph, maybe I'm mistaken in this case, though, because there were multiple offenders involved. Was Mr. Faber's photograph the only one that was picked out of the photo array who then participated in the lineup? Correct. Sergeant Flaherty testified that Faber was the only one who was both in the photo array and in the lineup, and Faber was the target of the photo array. So none of the other suspects were included in the photo array. All right, but to get around that, let's take it to the next level. Taking that is all being true. To get around that problem, the police department would have to find these fillers. So let's say my photo was in there, even though I don't think it looked like Earl Faber. So they'd have to go find the four fillers, or at least one more person or two more of these fillers, find where they currently live, find if they were in custody somewhere within the Cook County area, go out, locate them, bring them in to stand in the lineup, and then only if they still looked like they looked when they had the photograph as shown in Mr. Faber. Wouldn't that be what would be required to make it any good, to make it a legitimate, not a concern, but to remedy that problem? Wouldn't they have to go find the actual fillers which they took out of a mug book somewhere, find them, bring them in, and do that in a matter of, frankly, minutes, because that's how long these things take. Well, I don't think that that would be necessary to remedy the problem of him being the only one. If you can say for sure that the photo array wasn't suggestive, then you can say that the later identification wasn't based on the photo array. Unfortunately, in this case, we can't say anything about the photo array because we don't have it. So we can't say definitively if this court could say, well, we know that that photo array wasn't suggestive. So their identification in the photo array didn't make them later identify Faber, that both identifications could be deemed reliable in that instance. And that, I think, is one of the reasons why the legislature wanted these photo arrays to be disclosed, because we don't know if unconscious transfer occurs unless we can say for sure that the first photo array legitimately didn't influence them and didn't point to Faber in some unspecified way. I mean, we just don't know that. Do you have anything else? No, unless this court has any other questions. I ask that you reverse his convictions and direct the court to subpoena him. I'd like to know, I searched the record, and I cannot find, and if you are aware of, let me know, is there anywhere in the record that shows that the in-court identifications that the witnesses made of Faber, was that identification in any way influenced by this alleged wrongful photo array? Well, there's no way to know how the photo array influenced anything. I guess that's kind of the point underlying all of it, is that if the photo array started this domino process where he was identified in the photo array, then identified in the lineup, then it's going to be hard to say if the initial identification was based on a suspect photo array, and that led to the lineup photo identification. And then you could arguably say that then the in-court identification. There's nothing in the record to either verify that or dispute that. Actually, in this case where they're missing, first, was the photograph the lineup put into evidence? Yes, it's included as the appendix in the brief. I'm sorry, I apologize. But that being so, so going back to your last argument just a minute ago, where the witnesses are going to testify, they're being prepped by the state's attorney to go out and put the finger on Mr. Faber, if the state had the photograph array, your concern, I would suggest, would be very well based, because say here's the same five photographs Officer Flaherty showed you, the sergeant, and you picked number three, which is Earl Faber, who you're going to see at counsel table to your left. And so take a look at it. Okay, fine. So remember, when I show you the photo array, this is Mr. Faber. That's how you prep these people. Okay, it's Mr. Faber. And then you go out and say, well, number three, that's what I picked out two years, four, in this case, five years ago. This is a picture of the lineup five years ago. I picked number two, Mr. Faber. But here they don't have the photos of the photo array. So it would be impossible for the state attorney to say, ah, please remember this photograph. Maybe they did actually have Mr. Faber's photograph, but nobody else's. Is that how it worked? When they showed the photo array, did they actually show the photo of Mr. Faber from the photo array? We don't. They didn't show the witness. Okay, so my point is my point is. It doesn't exist. So I'm saying for what that's worth, which is nearly nothing, the normal concern you would have in showing a photo array to a witness before they testify can't exist if the photo array doesn't exist either. So they're not going to say I'm testifying today based on my picking the guy out five years ago because I'm showing the photo array right before I testify. And that's usually how it's done. But when you don't show them a photograph of it right before they testify because it doesn't exist, they're unlikely to say, ah, I remember the photo from five years ago, and that's what they got. If they've already created the impression that, admittedly, a five-year-old memory would be less vibrant than an immediate showing of the photo, but he's also the only defendant on trial, so it would be pretty easy to say. It's not hard to pick him up. No. In court, I mean. Yeah. You have plenty of time for reply. Thank you. Ms. Needham. May it please the court. Defendant confessed three times to shooting Deontay. The last time was videotaped. And in details, he went through the whole entire process of how he was involved in this shooting and how he stood in the middle of the intersection at Madison and Western and shot the 15-year-old Deontay as he lay in the middle of the street. He was identified by two witnesses. The evidence of his guilt is overwhelming. Therefore, the question we're examining today is whether any error occurred that denied the defendant a fair trial. And the answer to that question is no. The statute doesn't provide a remedy, and there's no indication that it requires automatic exclusion of the evidence. Instead, it's the trial court's discretion whether the evidence should be excluded, and the trial court properly exercises discretion in this instance and determined that the evidence could come in. As an initial matter, I'd like to point out that three people viewed the photo array, Mr. Christopher, Mrs. Christopher, and Mr. I think his name was Stallingworth. Only two identified him. There was a discussion that the photo arrays had been disclosed. Counsel said he had them. He said he didn't have them. The prosecutors thought that it was disclosed. We did have the inventory slip. But the bottom line is defendant should have had them, that he didn't have them. Now what is the remedy? When was the defense attorney made aware that nobody had these photographs, if you recall from the record? How surprised was he? It sounds like he was pretty surprised. Like the first time he really knew about it was when the state didn't show a photo array during their case in chief. Oh, no. It happened at the motion to suppress statements. So the motion to suppress statements, the photos were already gone? Yes, they were. They were. So there was not a surprise at trial. Yes. No. But did somebody, if you know from the record, did anybody go back and try to locate these photographs from the clerk's office? From the record? No, you can't. It's not there. Okay. Did you? Did I? Did you? No, I did not. Because it would have been part of a record in a co-defendant's case. So I would suggest that if I'm correct and if they followed the rules, which again not just the office today but the office 20 years ago also rarely followed the rules in this area of impounding evidence, they should be over at the Daly Center now if anybody occurred to look. The photo arrays in one of the co-defendants' cases? Yes. Okay. Maybe I'm wrong because maybe they didn't show the same photo array, right? Maybe that's why nobody thought to do it because it's impossible. Well, there was a lot. Because they showed separate photo arrays there. But there's a lot of material and at some point the cases were not severed and there were numerous counsels. And to answer your question, I don't know where they are or what came. I'm not asking you to look either. It sounds like you are because you said I should be looking for them. Were they lineups unduly suggested? Which lineup? The photo array? Yes. I would say they're not. And you can base it on the record on the officer's testimony that he looked for people the same race, gender, and age and provided them and questioned. It's not impossible to probe and question whether somebody, whether it was suggestive. You can ask the officer who's presenting the identification. You can ask the persons who are viewing it. Did anybody say anything to you? What was it that made you pick defendant? Those are questions that could have been asked and they weren't. What about the fact that the defendant was the only one in the lineup wearing the clothes that the perpetrator was described to have been wearing? He was the only person who was dressed in that manner. What about that? Well, defendant was in Cook County Jail at the time. He was brought over. He was changed out of his uniform into his civilian clothes, which were the clothes that matched the description the offender gave. So does that make it okay? No, it does not, but it's only one factor in whether it was. Well, defendant also physically stood out and looked different from the other people in the lineup. What about that? Now that's two factors. What about that? Well, defendant did not necessarily stand out. These are young men that all appear to be the same age. They're the same race. They had all the subjects sit because defendant is taller. And at the same time, it didn't compel his height and that he was what he was wearing, did not compel his identification when you had five people viewed the physical lineup and only two. I would just ask you what about the fact that defendant did stand out. He was taller, considerably taller than the other people in the lineup, and he was the only person in that lineup who was wearing the clothes that the perpetrator was described to have been wearing. And you're saying that doesn't matter. I mean, is that your response, it makes no difference? No, I'm saying that that's part of the factors that the trial court looks at when he's exercising his discretion, or whether that photo array, pardon me, the lineup should be suppressed. And I would also point out that when the trial court was exercising his discretion, defendant was not saying that this photo, this lineup should be excluded because defendant was wearing the same thing and that 107A5 was violated. So the trial court is looking at the whole lineup. He's hearing all about the procedures, what happened. I know that, but I'm asking you because one of the functions that we do as an appellate court is we review what the trial court does to see whether the trial court got it right. That's why we're all here. So I'm asking you what about the fact that the defendant was the only one in that lineup wearing the clothes that the perpetrator was described to have been wearing, and he stood out markedly from the other people in the lineup. Is that important or not? Well, the ultimate conclusion is whether he stood out markedly. And it's our position that he did not stand out markedly. You have subjects wearing a blue shirt, subjects wearing a red shirt. You have ‑‑ there's no requirement that we have to find ‑‑ But none of them were wearing the clothes that the perpetrator was described to have been wearing except the defendant, right? That's correct. Does that automatically mean that the ‑‑ I didn't put in the word automatically. I asked you a very narrow question. Is it important or not? That's all I'm asking. It's important as one factor in the overall review of whether the trial court abuses discretion. And even if the trial court did abuse its discretion, we do have defendants' repeated statements admitting that he was the shooter who shot Deontay. And we also have the fact that neither the photo array nor the physical lineup prompted defendants' confession. The police were already looking for him before the photo array. He was not confronted with the fact that he had been identified before he confessed. He was confronted with his co‑defendant's statements. And that's what made him say, I definitely want to tell you what happened. Was the jury advised of that, that his pals fingered him before he confessed? Was the jury? Yeah, so when the police testify about his confession, he goes into denial, and then the police say, hey, your pal said it was you. Ah, you're lying. Here, let's play the video. Holy cow, my partners gave me a hard time. No, I don't ‑‑ And then he confesses. Yeah, I don't think at trial ‑‑ I think that might have been the subject of the pre‑trial motion to suppress, so the jury was not impressed about ‑‑ I'm sure if it had been raised, it would have been a problem. Were other co‑defendants part of the lineup, or just ‑‑ Yes, two of the other co‑defendants were. Because looking at the photograph of the lineup, there are three signatures above them. The other two guys are wearing white T‑shirts, just not, as we say, Dago teeth. Right, defendant is the only one wearing it, but as I said, it's just one factor the trial court was exercising its discretion. The evidence of his guilt is overwhelming. For these reasons, we ask you to affirm defendant's convictions. Thank you. Thank you. Thank you. Sir, Ken, just briefly. I just have one kind of basic point in rebuttal, is that the problem with the state's position is that nothing has really changed because of the statute. All of the state's analysis and all of the discussion goes back to the law pre‑statute, the sort of abuse of discretion standard, even. I would argue that's maybe not the right standard of review to apply because we have a statute that's been violated in this instance, and this court can review de novo whether the statute was violated and what the remedy is. Oh, it was violated. Nobody would suggest. They're not suggesting it wasn't violated. It's absolutely violated. Right. But the state is asking this court to grant the trial court some sort of discretion when the trial court wasn't even really analyzing the violation of the statute and there hasn't been any law to guide the trial courts in what happens when such a… So you think we ought to make an example of them using this case. Is that it, Mr. Getch? Well, I think this is an opportunity for this court to define what happens when this statute is violated. Most definitely. I mean, with that, I don't really have anything else. I think that the main point is that the statute has changed things and that we can't necessarily fall back on this old analysis when there's something that has changed. Well, I want to thank you, Mr. Getch, for having the photographs in here. We argue our identification up here with some frequency and almost nobody ever gives us the photographs. So I really appreciate the fine briefs and fine argument on both sides. This case will be taken under advisement and this court will be adjourned.